IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| OYSTER OPTICS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:18-CV-00206-JRG |
| | § | |
| INFINERA CORPORATION, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Infinera Corporation's ("Infinera") Motion for Summary Judgment Regarding Its License and Release Defenses (the "Motion"). (Dkt. No. 39.) The Court heard oral argument on the Motion on June 12, 2019. (Dkt. No. 74.) Also before the Court are Plaintiff Oyster Optics, LLC's ("Oyster") Notice of Supplemental Material Facts and Notice of Inaccurate Case Quote in Defendant's Slide and Argument at Hearing, (collectively, the "Notice" or "Notices"), and Infinera's Response to Plaintiff's Presentation Notice (the "Response"). (Dkt. Nos. 72, 80, 81.)  Having considered the parties' briefing and oral arguments as noted above, the Court **GRANTS** the Motion for the reasons set forth herein.

I. **INTRODUCTION**

On November 24, 2016, Oyster filed suit in this court against Coriant (USA), Inc., Coriant North America, LLC, Coriant Operations, Inc. (collectively, "Coriant"), Infinera, and several other defendants for patent infringement. *See Oyster Optics, LLC v. Coriant America, Inc., et al.*, No. 2:16-cv-01302-JRG (the "Litigation"). The Court consolidated those cases for pretrial purposes.

1

(Case No. 2:16-cv-01302-JRG, Dkt. No. 23.)[1]  On May 15, 2018, Oyster filed the above-captioned case against Infinera, alleging infringement of U.S. Patent Nos. 7,620,327 (the "'327 Patent"); 8,913,898 (the "'898 Patent"); and 9,749,040 (the "'040 Patent") (collectively, the "Patents-in-Suit").  (Dkt. No. 1).  The Court severed Oyster's earlier-filed case against Infinera from the Litigation and consolidated it with this case.  (Dkt. No. 603.)

On June 28, 2018, Oyster and Coriant entered into an agreement that settled Oyster's claims against Coriant in the Litigation (the "Agreement").  (Dkt. No. 39–1.)  The Agreement grants Coriant and its "Affiliates" a "royalty-free, irrevocable, perpetual, and fully paid-up license" to the "Licensed Patents," (*id.* § 4.1), and releases Coriant and its "Affiliates" from "any and all claims . . . based on the Licensed Patents" that "aris[e] from activities" in the United States "up to" and "prior to" June 27, 2018, (*id.* § 3.1).  On October 1, 2018, Infinera acquired Coriant, and "now owns, either directly or indirectly, 100% of the shares or ownership interest in [Coriant]."  (Dkt. No. 39–2 ¶¶ 4, 6.)  Having acquired Coriant, Infinera argues that it is now an "Affiliate" of Coriant, and as such, moves for summary judgment that Oyster's infringement claims are barred by the release and license provisions in the Agreement.  (Dkt. No. 39.)

## II.    LEGAL STANDARDS

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for

---

[1] Unless otherwise noted, all citations to docket entries are to Case No. 2:18-cv-00206-JRG.

the nonmoving party." *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48 (emphasis in original).

To resolve the Motion, the Court must construe the Agreement.  Contract interpretation is a question of law and may be resolved by summary judgment.  *See Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 85 (2d. Cir. 2002) (applying New York contract law); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920, N.E.2d 359, 363 (N.Y. 2009) ("Whether an agreement is ambiguous is a question of law for the courts.").  There is no dispute between the parties that New York law governs the Agreement and its construction.

### B.  License and Release

"A patent grants its owner the right to exclude others from making, using, or selling the patented invention.  However, all or part of the right to exclude may be waived by granting a license, which may be express or implied." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995) (internal citations omitted).  "[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee" and "can be written to convey different scopes of promises not to sue, *e.g.*, a promise not to sue under a specific patent, or more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.  *Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987).

Similarly, a patent owner may, by agreement, promise not to assert claims based on conduct that arose at a particular time and place.  Such promises are known as "releases" from liability. *See, e.g.*, *Dinesol Bldg. Prod., Ltd. v. Tapco Int'l, Inc.*, 201 Fed. Appx. 764, 766 (Fed. Cir. 2006)

(determining "whether the Settlement Agreement released Dinesol from claims that its custom plastic shutters infringe Tapco's shutter patents").

Generally, licenses apply prospectively and releases apply retroactively. *See, e.g.*, *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997) (explaining that "the license grants full protection against a claim of future infringement" and that to deprive another from "the right to sue for past damages for past infringement" "would require a release, not a license"); *Murray-Gardner Mgt. v. Iroquois Gas Transmission Sys.*, 646 N.Y.S.2d 418, 419 (Sup. Ct. 1996) ("Another applicable principle is that releases bar suits on causes of action arising on or prior to the date of their execution but will not bar subsequent claims unless they are specifically embraced within the release or fall within the fair import of its terms."). However, any such limitations are a matter of contract interpretation under the governing law. *See e.g.*, *Realtime Data, LLC v. T-Mobile USA, Inc.*, 936 F. Supp. 2d 795, 801–04 (E.D. Tex. 2013) (interpreting license and release provisions under New York law).

### C.  Contract Interpretation

As noted, the Agreement is governed by New York law. (Dkt. No. 39–1 §9.)  Under New York law, a contract must be construed in accordance with the parties' intent. *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013).  To determine the parties' intent, the court first looks to the terms of the agreement. *Id.* ("The best evidence of what parties to a written agreement intend is what they say in their writing."); *U.S. Bank Nat. Ass'n v. Mask*, 30 N.Y.S.3d 713, 715 (Sup. Ct. 2016) ("The court's fundamental objective in interpreting a contract is to determine the parties' intent from the language they have employed.").  "A written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Schron*, 986 N.E.2d at 433; *see also Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014)

("Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.").

A court may consider "parol evidence—evidence outside the four corners of the document—" only if a term is ambiguous.  *Schron*, 986 N.E.2d at 433.  "Whether an agreement is ambiguous is a question of law for the court[]" and "is determined by looking within the four corners of the document, not to outside sources." *Riverside*, 920 N.E.2d at 363; *Trans-Pro Logistic Inc. v. Coby Electronics Corp.*, No. 05 CV 1759 (CLP), 2012 WL 526764, at *9 n.18 (E.D.N.Y. Feb. 16, 2012) ("[T]he search for ambiguity must be conducted within the four corners of the writing.").  A term is ambiguous if it "fails to disclose its purpose and the parties' intent, or when . . . [it] is susceptible of two reasonable interpretations." *Ellington*, 24 N.Y.3d at 244 (internal citations omitted).  "[A] contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms." *Bank of N.Y. Mellon v. WMC Mortgage, LLC*, 22 N.Y.S.3d 3, 8 (Sup. Ct. 2015); *see, e.g.*, *Triax Capital Advisors, LLC v. Rutter*, 921 N.Y.S.2d 54, 56–57 (Sup. Ct. 2011) (holding that emails between the parties cannot be used to create an ambiguity in an otherwise clear agreement).

These principles are limited by two maxims.  First, if a contract contains a merger clause, "a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'" *Schron*, 986 N.E.2d at 433; *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292, 298 (Sup. Ct. 2012) ("Furthermore, the agreement contains both a no-oral-modification clause and a broad merger clause, which as a matter of law bars any claims based on an alleged intent that the parties failed to express in writing.").  Second, New York courts are "extremely reluctant" to imply or vary terms

5

in commercial contracts that were "negotiated at arm's length" between "sophisticated, counseled business people." *Ashwood*, 948 N.Y.S.2d at 297.  In those cases, the rule that a document's clear and unambiguous terms should govern is "appl[ied] with even greater force."  *Id*.; s*ee, e.g.*, *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 174 (N.Y. 2002) (explaining that court will not rewrite terms "under the guise of contract interpretation" to avoid a harsh outcome for Plaintiff).

In sum, New York courts apply an "objective theory of contract." *SR Intern. Business Ins. Co. Ltd., et al. v. World Trade Cntr. Prop. LLC, et al.*, 467 F.3d 107, 125 (2d Cir. 2006) (applying New York law).  Contracts are construed "by looking to 'the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'"  *Id.*  Only when a contract is ambiguous may the court consider extrinsic evidence, and even then, "a party's uncommunicated subjective intent cannot supply the ultimate meaning of an ambiguous contract."  *Id.* at 125–26 (citing cases in which courts considered parol evidence because the contracts were ambiguous).

## III.    DISCUSSION

The Agreement provides a release and license under the Patents-in-Suit to Coriant and its "Affiliates."  (Dkt. No. 39–1 §§ 3.1, 4.1.)  Infinera argues that since it is an "Affiliate" of Coriant, those "provisions independently bar Oyster from continuing to assert its patent infringement claims against Infinera."  (Dkt. No. 39 at 1.)  Oyster disagrees.  It argues that (1) Infinera is not covered by the release and license provisions because it became an "Affiliate" *after* the effective date of the Agreement, and (2) regardless, Infinera breached express covenants in the Agreement. (Dkt. No. 44.)

The Court finds, and the parties agree, that the contract is clear and unambiguous.[2] Accordingly, the Court limits its analysis to the four corners of the document.  *See Schron*, 986 N.E.2d at 433.  The Court first reviews the relevant definitions set forth in Section 1 of the Agreement.  Then, the Court applies those definitions to the release and license provisions to determine if they bar Oyster's claims against Infinera.  In conducting this analysis, the Court affords terms their plain meaning and considers the contract as a whole.  *Ellington*, 24 N.Y.3d at 244.[3]

---

[2] (Dkt. No. 39 at 9 ("There is no ambiguity in any of the relevant provisions of the Agreement") (Infinera's Motion)); Dkt. No. 44 at at 5 (arguments based on "the plain language of the Agreement") (Oyster's response to Motion).)

[3] Oyster argues that New York law requires courts to consider both the text of the agreement *and* the surrounding circumstances that gave rise to it—even if the contract is clear and unambiguous on its face.  (Dkt. No. 48 at 3 ("Accordingly, New York courts interpret releases under 'special rules' and caution that a release's 'literal language should not be determinative of the ultimate result or be applied mechanically.'"); (Dkt. No. 77 at 17–25 (Oyster's presentation slides).) Consistent with that view, Oyster has submitted extrinsic evidence regarding the parties' subjective intent vis-à-vis the release and license provisions of the Agreement.  (Dkt. Nos. 72, 80.)  The Court has conducted a careful review of New York contract law, and finds that, despite Oyster's arguments to the contrary, New York law *does not* permit courts to consider parol evidence to construe a clear and unambiguous contract.  *See Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 174 (N.Y. 2002) ("In contrast to the 'four corners' rule that New York has long applied, California courts preliminary consider all credible evidence of the parties' intent in addition to the language of the contract."); *In re Rickel & Associates, Inc.*, 272 B.R. 74, 85 (S.D.N.Y. 2002) ("Given the *facial ambiguity* [of the release provision], the Court may consider extrinsic evidence that is consistent with the express language of the agreement.") (emphasis added); *Murray-Gardner Mgt. v. Iroquois Gas Transmission Sys.*, 646 N.Y.S.2d 418, 419 (Sup. Ct. 1996) ("It is well settled that releases are contracts that, *unless their language is ambiguous*, must be interpreted to give effect to the intent of the parties as indicated by the language employed.") (emphasis added).  Absent a finding of ambiguity or an allegation of fraud, mistake, or duress, New York courts limit contractual interpretation to the four corners of the document.  *See, e.g.*, *Rubycz-Boyar v. Mondragon*, 790 N.Y.S.2d 266, 267 (Sup. Ct. 2005) ("Our review of the release here reveals no ambiguity that would permit consideration of extrinsic evidence."); *Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 330 (S.D.N.Y. 2002) (holding that "nothing within the four corners of the Release suggests an ambiguity that would permit this Court to look beyond the document to extrinsic evidence as to the parties' intent" and that  "absent some evidence that the Release was 'procured by fraud, duress, undue influence, or some other illegal means,'  Kraft's claim for breach of contract is barred by the Release"); *Mangini v. McClurg*, 249 N.E.2d 386, 388 (N.Y. 1969) (considering extrinsic evidence where the parties "alleged that the release was entered

### A.   Definitions from the Agreement

#### i.   Effective Date

The Agreement defines the "Effective Date" as June 27, 2018.  (Dkt. No. 39–1, preamble.)

#### ii.   Litigation

The Agreement defines "Litigation" as the "litigation pending in the United States District Court for the Eastern District of Texas, Lead Case No. 2:16-cv-01302-JRG-RSP, in which Oyster has asserted infringement of U.S. Patent Nos. 6,594,055; 6,469,816; 6,476,952; 7,099,592; 8,913,898; 7,620,327; 8,374,511; and 9,363,012 (the 'Patents-in-Suit') by the Coriant Defendants." (*Id.*) "Coriant Defendants" are defined as "Coriant (USA), Inc., Coriant North America, LLC, [and] Coriant Operations, Inc." (*Id.*) The "Litigation," which may be referred to herein as "Case No. 2:16-cv-01302-JRG-RSP," is the same "Litigation" defined in the Background section above.

#### iii.   Consolidated Litigation

"Consolidated Litigation" refers to Oyster's "assert[ion] [of] infringement of the Patents-in-Suit by other defendants named in civil actions pending in the United States District Court for the Eastern District of Texas, which civil actions have been consolidated into the above-identified Litigation." (*Id.*) Oyster's infringement claims against Infinera were initially consolidated with the Litigation, and so Infinera is one of the "other defendants" named in the Consolidated Litigation. (*See* Case No. 2:16-cv-01302-JRG-RSP, Dkt. No. 23.)

#### iv.   Territory

"Territory" is defined as the "United States." (Dkt. No. 39–1 § 1.8.)

---

into under a mutual mistake of fact"). Since the Agreement is unambiguous and Oyster has not moved for rescission, the Court limits its analysis to the parties' express written terms.

### v. Affiliate

An "Affiliate" means "any Person, now or in the future, which . . . (ii) has Control of a Party hereto."  (*Id.* §1.1.)  "Person" includes "any . . . corporation," (*id.* §1.5), and "Control" means, *inter alia*, "that fifty percent (50%) or more of the controlled entity's shares or ownership interest representing the right to make decisions for such entity are owned or controlled, directly or indirectly, by the controlling entity."  (*Id.* §1.1.)  "Party" includes Coriant.  (*Id.*, preamble.)

Substituting "Person" and "Control" into the definition of "Affiliate," an "Affiliate" is: "any [corporation], now or in the future, which . . . (ii) has [fifty percent (50%) or more of the controlled entity's shares or ownership interest representing the right to make decisions for such entity . . . owned or controlled, directly or indirectly, by the controlling entity]."

Infinera is a "Person" because it is a corporation.  (Dkt. No. 39–2 ¶ 3 ("Infinera is a corporation founded in 2000 and is now one of the leading optical hardware producers worldwide.") (Declaration of Brad Feller on behalf of Infinera).)  Infinera also "has Control of a Party hereto" because it wholly-acquired Coriant on October 1, 2018, and "now owns, either directly or indirectly, 100% of the shares or ownership interest in Coriant (USA) Inc., Coriant Norther America, LLC, and Coriant Operations, Inc."  (*Id.* ¶¶ 4, 6.)  As a result, the Court finds that Infinera is an "Affiliate" as defined in Section 1.1 of the Agreement.

### vi. Licensed Patents

"Licensed Patents" are defined, *inter alia*, to "include, without limitation, the patents and applications set forth in Appendix B."  (Dkt. No. 39–1 § 1.3.)  Appendix B lists U.S. Patent Nos. 9,749,040; 8,913,898; and 7,620,327, which are the Patents-in-Suit.  (*Id.* Appendix B.) Accordingly, the Patents-in-Suit are "Licensed Patents" under the Agreement.

### vii.  Licensed Product

"Licensed Product" is defined as "any Subject Matter made, have made, used, offered for sale, sold, imported, exported, distributed, or otherwise supplied, provided or disposed of, in the U.S. at any time, directly or indirectly by or for or on behalf of any of the Coriant Defendants, their Affiliates, or respective predecessors, predecessors-in-interest, successors, or successors-in-interest, and combinations of the foregoing." (*Id.* § 1.4.)  "Subject Matter" means "regardless of origin, any method(s), process(es), product(s), product line(s), service(s), device(s), system(s), component(s), hardware, software and/or software algorithm, and/or combination(s) of any one or more of the foregoing." (*Id.* § 1.7.)

Substituting "Subject Matter" into the definition of "Licensed Product," a "Licensed Product" is defined as "regardless of origin, any method(s), process(es), product(s), product line(s), service(s), device(s), system(s), component(s), hardware, software and/or software algorithm, and/or combination(s) of any one or more of the foregoing, made, have made, used, offered for sale, sold, imported, exported, distributed, or otherwise supplied, provided or disposed of, in the U.S. at any time, directly or indirectly by or for or on behalf of any of the Coriant Defendants, their Affiliates, or respective predecessors, predecessors-in-interest, successors, or successors-in-interest, and combinations of the foregoing."

Oyster alleges that Infinera infringes the Patents-in-Suit because it "makes, uses, offers for sale, and/or sells in the United States" the following products: products utilizing Infinera's Infinite Capacity Engine ("ICE"), including the ICE Version 4 and ICE Version 5; the DNT Family; DTN-X Family; Could Xpress Family; transmode's Tm-4000 platforms; 100G OTN Muxponder, Infinera 100 G OTN Transponder; Infinera 100 OTN Transponder II; Infinera EMXP IIe packet-optical transport switch Family; and the Infinera PT-Fabric packet-optical transport switch

products and the compatible chassis in which they are installed, including without limitation the TM-300, TM-3000/II, TM-301, and TM-301/II (collectively, the "Accused Products").  (Dkt. No. 1 ¶¶ 11, 25, 39 (Complaint).)   Since Infinera is an "Affiliate" of Coriant and the Accused Products are alleged to have been "made, used, offered for sale, and/or sold in the United States," the Court finds that the Accused Products in this case are "Licensed Products" under the Agreement.

### B.  The Release

Having reviewed the relevant definitions, the Court first addresses whether Infinera is released from liability under Section 3.1 of the Agreement (the "Release").  (Dkt. No. 39–1 § 3.1.) The Court begins its analysis with the express terms of the Release, which states in relevant part:

> 3.1.   <u>Oyster's Release to the Coriant Defendants</u>: In consideration of the payment recited in this Agreement and in consideration of the covenants, licenses, and releases granted herein as well as the dismissal of the Litigation to be filed with the Court and joining with Oyster in motions under 35 U.S.C. 317 to terminate the Coriant Defendants' participations in all *Inter Partes* Review ("IPR") proceedings involving any of the Patents-in-Suit, **Oyster provides a release to each of the Coriant Defendants and their Affiliates**.  **The scope of that release is as follows**: **Oyster, on behalf of itself and its Affiliates** . . . **does hereby forever release and discharge** the Coriant Defendants, **their Affiliates** . . . , from **any and all claims,** demands, matters, rights, or causes of action **asserted or assertable without regard to jurisdiction questions**, in the Territory, **whether known or unknown**, **arising from activities in the Territory up to the Effective Date**, **whether or not raised in the Litigation**, **based on the Licensed Patents or based on the conduct of the Litigation**, including without limitation all claims . . . whatsoever, in law or equity, and also **including without limitation any asserted or unasserted claims of infringement of any of the Licensed Patents** on account of, in whole or in part, any method, process, product, product line, service, device, system, component, hardware, software and/or software algorithm, and/or combination of any one or more of the foregoing, made, have made, used, offered for sale, sold, imported, exported, distributed, or otherwise supplied, provided or disposed of, directly or indirectly, **by or for or on behalf of any of** the Coriant Defendants and their **Affiliates**, **prior to the Effective Date**. . . .

(*Id.* (emphasis added).)

Focusing on the scope of the Release, it provides that: "Oyster . . . does hereby forever release and discharge the Coriant Defendants, their Affiliates . . . from any and all claims . . .

asserted or assertable without regard to jurisdiction questions, in the Territory, whether known or unknown, arising from activities in the Territory up to the Effective Date, whether or not raised in the Litigation, based on the Licensed Patents . . . including without limitation any asserted or unasserted claims of infringement of the Licensed Patents . . . by or for or on behalf of any of the Coriant Defendants and their Affiliates, prior to the Effective Date."  (*Id.*)

This provision includes the terms "Affiliate," "Territory," "Effective Date," "Litigation," and "Licensed Patents," which are each defined in Section 1.1 of the Agreement.  As discussed above, Infinera is an "Affiliate;" "Territory" means the United States; the "Effective Date" is June 27, 2018; the "Litigation" refers to Case No. 2:16-cv-01302-JRG-RSP; and "Licensed Patents" includes the Patents-in-Suit.  *See supra* Part III.A.i.  Substituting the definitions of those terms into Section 3.1, the Release states as follows:  "Oyster . . . does hereby forever release and discharge the Coriant Defendants, [Infinera] . . . from any and all claims . . . asserted or assertable without regard to jurisdiction questions, in the [United States], whether known or unknown, arising from activities in the [United States] up to [June 27, 2018], whether or not raised in [Case No. 2:16-cv-01302-JRG-RSP], based on the [Patents-in-Suit]. . . including without limitation any asserted or unasserted claims of infringement of the [Patents-in-Suit]. . . by or for or on behalf of any of the Coriant Defendants and [Infinera], prior to [June 27, 2018]."  (*Id.*)

Considering the contract as a whole and the plain meaning of each term, the Court finds no ambiguity in the Agreement.  *Ellington*, 24 N.Y.3d at 244.  The text is clear: the Release applies to (1) Infinera because it is an "Affiliate;" and (2) the claims asserted by Oyster against Infinera because the claims (i) are based on "infringement of the [Patents-in-Suit];" (ii) are alleged to "aris[e] from activities in the [United States];" and (iii) are alleged to have occurred "up to [June 27, 2018]."  (*Id.*; *see also* Dkt. No. 1 ¶¶ 3–5, 10–50) (Complaint).)

Oyster argues that Infinera is not released from liability because it became an "Affiliate" after the Effective Date of the Agreement.  (Dkt. No. 44 at 2.)  According to Oyster, "Affiliate" is defined as an entity with *present* "Control" of a Party to the Agreement, and so "a party is an Affiliate . . . only during such period of time as it has the requisite control relationship with a Party."  (*Id.* at 5.)  Oyster also submits that the Release "is both limited to claims . . . arising from activities in the Territory up to the Effective Date" and "to claims arising from acts 'by or for or on behalf of any of the Coriant Defendants and their Affiliates, prior to the Effective Date.'"  (*Id.* at 6.)  Oyster argues that "[t]hese two references to 'the Effective Date' are redundant unless the second reference is intended to modify 'Affiliates.'"  (*Id.*)

Oyster's arguments are unavailing.  "Affiliate" is expressly defined as any "Person, now or *in the future*, which . . . (ii) has Control of a Party hereto."  (Dkt. No. 39–1 § 1.1 (emphasis added).)  When that definition is substituted into the Release, the provision reads: "Oyster provides a release to each of the Coriant Defendants and their Affiliates [*i.e.*, any Person, now or *in the future*, which: . . . (ii) has Control of a Party hereto]."  (*Id.* § 3.1 (emphasis added).)  There is no reasonable doubt that based on the express written language, the Release was intended to apply to both Affiliates at the time the Agreement became effective *as well as* to entities that became "Affiliates" "in the future."  (*Id.*)  To view this otherwise would be to acknowledge a direct impediment to just the type of future acquisition that occurred between Coriant and Infinera.  That Coriant would not want a future potential acquirer to be unprotected and thereby threaten such a future sale is wholly consistent with the Agreement's "in the future" language and its clear meaning.

The Court is also not persuaded that "prior to the Effective Date" was intended to modify "Affiliates" such that only those that existed before the Effective Date are released from liability.

When the provision is read as a whole, it is clear that the clause "prior to the Effective Date" modifies the *types of claims* that are released, and not the entities that can claim the benefit of the release.

> 3.1.     The scope of that release is as follows: Oyster. . . does hereby forever release and discharge the Coriant Defendants, their Affiliates . . . , from any and all claims . . . asserted or assertable without regard to jurisdiction questions, in the Territory, whether known or unknown, arising from activities in the Territory up to the Effective Date, whether or not raised in the Litigation, based on the Licensed Patents or based on the conduct of the Litigation, including without limitation all claims . . . whatsoever, in law or equity, **and also including without limitation any asserted or unasserted <u>claims</u> of infringement of any of the Licensed Patents on account of, in whole or in part, any method, process, product, product line, service, device, system, component, hardware, software and/or software algorithm, and/or combination of any one or more of the foregoing, made, have made, used, offered for sale, sold, imported, exported, distributed, or otherwise supplied, provided or disposed of, directly or indirectly, by or for or on behalf of any of the Coriant Defendants and their Affiliates,** <u>prior to the Effective Date</u>. . . .

(*Id.* (emphasis added).)

The bold section above clarifies that the Release "also includ[es] without limitation any asserted or unasserted claims of infringement of any of the Licensed Patents."  That clause is modified by the phrase "prior to the Effective Date" as indicated by the commas separating the clauses.  (*Id.* (". . . **,** and also including without limitation any asserted or unasserted claims of infringement of any of the Licensed Patents on account of**,** in whole or in part, any method . . . . , and/or any combination of any one or more of the foregoing, made, have made, . . . , directly or indirectly, by or for or on behalf of any of the Coriant Defendants and their Affiliates**,** prior to the Effective Date.") (emphasis added).)[4]  Oyster's interpretation would render superfluous the

---

[4] "Let there be no mistake—the comma wields a power far greater than its humble looks might suggest.  'You will go you will return never in the battle you will perish' is the most famous example of it.  This saying is usually attributed to the Oracle of Delphi, and it is supposed to be an answer to the question of whether or not to go to war.  If you place a comma before 'never,' the answer becomes a green light.  Place it after 'never,' and then answer becomes a warning against

Agreement's express definition that "Affiliates" include "any Person now, or in the future," and would result in a strained reading of the text. *See Bank of N.Y. Mellon*, 22 N.Y.S.3d at 5 ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.").

Anticipating that the Court might find that the Release applies to Infinera, Oyster presents an alternative ground for denying the Motion.  (Dkt. No. 44 at 8–10.)  It argues that Coriant and Infinera have violated the Release's representation and warranty clause:

> The Coriant Defendants represent and warrant that none of the Coriant Defendants nor their Affiliates sell or supply optical-telecommunications transceivers, or components for optical-telecommunications transceivers, to any of the other named defendants in the Consolidated Litigation, although the Parties to this Agreement agree that the remedy for any breach by the Coriant Defendants of this representation and warranty is limited to an exclusion from the scope of this Paragraph 3.1 of such other named defendants with respect to those sales or supply that give rise to such breach.

(Dkt. No. 39–1 §3.1.)  According to Oyster, this language means that "the release was not intended to extend to Affiliates, [such as Infinera], that themselves *are* defendants in the Consolidated Litigation."  (Dkt. No. 44 at 9 (emphasis in original).)  Oyster argues that Infinera employs a "vertically integrated" business model and "'supplies' transceivers and their components to itself." (*Id.*)  Oyster contends that any "products and components supplied in this manner are excluded from the release." (*Id.* at 10.)

The Court disagrees.  The plain text of the warranty states that "[t]he Coriant Defendants represent and warrant that none of the Coriant Defendants nor their Affiliates sell or supply optical-telecommunications transceivers, or components for optical-telecommunications transceivers, to any of the *other* named defendants in the Consolidated Litigation."  (Dkt. No. 39–1 § 3.1 (emphasis

---

going to war."    *Comma Rules for Business Emails*, GRAMMARLY (Jan. 10, 2016), https://www.grammarly.com/blog/comma-rules-for-business-emails/.

added).)  By its terms, the provision does not apply to sales or delivery of supplies by Infinera to

*itself*.  Moreover, there is no evidence within the four corners of the document that the parties

intended to exclude the defendants in the Consolidated Litigation from the Release.  Preceding the

warranty statement in Section 3.1 is a clause about customer sales.  That section informs the scope

of the Release's warranty, and states in relevant part:

> The release provided by this Paragraph 3.1 also extends to all customers, users, distributors, buyers, foundries, manufacturers, suppliers, integrators, and resellers of Licensed Product or components thereof, but only to the extent such customers, users, distributors, buyers, foundries, manufacturers, suppliers, integrators, and resellers exported or imported, made, have had made, used, distributed, offered to sell, sold, or otherwise supplied, provided or disposed of Licensed Product or components thereof.  Pursuant to the Definition of Licensed Products, this does not release any products or components thereof from Third Parties that were not by, for, or on behalf of the Coriant Defendants, their Affiliates, or respective predecessors, predecessors-in-interest, successors, or successors-in-interest.  The Coriant Defendants represent and warrant that none of the Coriant Defendants nor their Affiliates sell or supply optical-telecommunications transceivers, or components for optical-telecommunications transceivers, to any of the other named defendants in the Consolidated Litigation, although the Parties to this Agreement agree that the remedy for any breach by the Coriant Defendants of this representation and warranty is limited to an exclusion from the scope of this Paragraph 3.1 of such other named defendants with respect to those sales or supply that give rise to such breach.

(Dkt. No. 39–1 §3.1.)

This section states that the Release extends to all past sales or supplies made by "customers,

users, distributors, buyers, foundries, manufacturers, suppliers, integrators, and resellers of

Licensed Product or components thereof."  (*Id.*)  However, such extension is limited in two ways:

(1) it does not apply to past sales or supplies made by Third Parties; and (2) it does not apply to

past sales or delivery of supplies by the Coriant Defendants and their Affiliates to "any of the other

named defendants in the Consolidated Litigation."  (*Id.*)  There is nothing in the text that indicates

the Release is otherwise inapplicable to past sales made by or supplies delivered by "any of the

other named defendants in the Consolidated Litigation" *generally*.  Nor is there any support for

such an interpretation in any other part of the Agreement.  Where, as here, the "release is executed 'in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if the language of the release is clear . . . the intent of the parties [is] indicated by the language employed." *Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 330 (S.D.N.Y. 2002) (applying New York law).  If Oyster and Coriant wanted to expressly exclude all defendants in the Consolidated Litigation from the Release, "they could have easily expressed this intent in the language of the agreement." *Ashwood*, 948 N.Y.S.2d at 298.  They did not do so here.  As a result, the Court finds that the Release is clear and applies to Oyster's claims against Infinera.[5]

### C.  The License

The Court next determines whether Infinera has a license to the Patents-in-Suit under Section 4.1 of the Agreement (the "License").  (Dkt. No. 39–1 § 4.1.)  Like the Release, the Court first examines the relevant text:

> 4.1     Subject to the terms and conditions of this Agreement, Oyster hereby grants to each of the Coriant Defendants, their Affiliates, a non-exclusive, non-transferable, non-assignable (except as provided herein), royalty-free, irrevocable, perpetual, and fully paid-up license, without the right to sublicense, in the Territory under the Licensed Patents, to make, have made, use, offer for sale, sell, import, export, distribute, or otherwise supply, provide or dispose of, the Licensed Product.

(*Id.*)

Section 4.1 includes the terms "Affiliates," "Licensed Patents," "Territory," and "Licensed Product," which are each defined in Section 1.1 of the Agreement.  As discussed above, Infinera

---

[5] As Infinera indicates in its Response to Oyster's Notices, both at the hearing and in its Notices to the Court, Oyster presented "new theories long after the briefing on Infinera's summary judgment motion concluded," including "new arguments regarding third-party beneficiaries, what claims qualify as 'assertable,' and fraud in the inducement."  (Dkt. No. 81 at 2.)  Most, if not all, of these arguments rest on parol evidence.  Given the untimeliness of these arguments and the clear terms of the Agreement, the Court does not consider these new theories in resolving the instant Motion.

is an "Affiliate;" the Patents-in-Suit are "Licensed Patents;" "Territory" means the United States; and the Accused Products qualify as "Licensed Product[s]." *See supra* Part III.A.i.  Substituting those definitions into Section 4.1, the provision reads:

> 4.1     Subject to the terms and conditions of this Agreement, Oyster hereby grants to each of the Coriant Defendants,  [Infinera], a non-exclusive, non-transferable, non-assignable (except as provided herein), royalty-free, irrevocable, perpetual, and fully paid-up license, without the right to sublicense, in the [United States] under the [Patents-in-Suit], to make, have made, use, offer for sale, sell, import, export, distribute, or otherwise supply, provide or dispose of, the [Accused Products].

(*Id.*)  Under a plain reading of the text, the Court finds that the Agreement expressly grants Infinera, an "Affiliate," a license under the Patents-in-Suit to "make . . . use, offer for sale, sell, import, export, distribute, or otherwise supply, provide, or dispose of, the [Accused Products]" in the United States.  (*Id.*)

Oyster argues that Infinera is not entitled to a license because it violated the Agreement's "no assignment" clause.  Section 4.1 states that the License is "non-assignable (except as provided herein)."  (*Id.*)  Sections 13.2 outlines the types of assignments permitted under the Agreement:

> 13.2    This Agreement shall be separately assignable by the Coriant Defendants: (i) to any of their Affiliates; and (ii) to any entity that either acquires all or substantially all of the assets and/or business of the Coriant Defendants to which this Agreement relates or is a partner in a merger, consolidation, equity exchange or reorganization with respect to such business, but in either event only as to (a) Licensed Product released or substantially developed before the date of such acquisition or other transaction, and (b) any successors of the Licensed Product of (a); and (iii) with the written consent of Oyster, which such consent shall not be unreasonably withheld.

(*Id*. § 13.2.)

Oyster argues that "[t]he former Coriant business and product lines are being incorporated into Infinera" and that "by transferring manufacture and/or sale of these products to Infinera, it has also transferred the associated rights and benefits under the license to Infinera."  (Dkt. No. 44 at

18

11.)  Without much explanation, Oyster claims that the "intent of the assignment [provision] was

to prevent an acquirer, [such as Infinera] from immunizing its own products by acquiring Coriant."

(*Id.* at 12.)

The Court finds Oyster's argument to be both logically challenged and inconsistent with

the plain terms of the Agreement.  Section 4.1 expressly grants a license "to each of the Coriant

Defendants" and "their Affiliates" and that such a license is "nonassignable (except as provided

herein)."  (Dkt. No. 39–1 § 4.1.)  Infinera's license rights stem *directly* from its status as an

"Affiliate."  Whether or not any purported assignment of the Agreement has occurred is simply

irrelevant.  Even if such an assignment did occur, Section 13.2 expressly states that the Agreement

"shall be separately assignable by the Coriant Defendants: (i) to any of their Affiliates."  (*Id.* §

13.2(i).)  There is simply nothing in the text to suggest that the License is inapplicable to products

made by companies that acquire Coriant.  *See Greenfield*, 780 N.E.2d at 173 ("[O]ur established

precedent [is] that silence does not equate to contractual ambiguity.").  Accordingly, under the

Agreement's unambiguous text, the Court finds that the Accused Products are licensed under the

Patents-in-Suit.

### D.  No Circumvention Covenant

As a final ground for denying summary judgment, Oyster argues that even if its claims

against Infinera are covered by the Release and License, Infinera cannot enforce those provisions

because it breached the Agreement's "no circumvention" covenant.  (Dkt. No. 44 at 13–14.)  That

provision is contained in Section 14 of the Agreement (the "No Circumvention Clause"):

> 14.     Further Assurances and No Circumvention.  . . . Each Party also covenants
> and agrees to not act through or in conjunction with any Affiliate or Third Party to
> circumvent or frustrate the purposes of this Agreement, and to not structure any
> future transactions either that are in conflict with this Agreement or where the effect
> of such transaction is to limit the licenses, rights, releases, covenants, or immunities
> provided for under this Agreement.

(Dkt. No. 39–1 § 14.)

According to Oyster, "[a]mong the purposes of the Agreement expressed in Section 3.1 and 13.2 was to prevent other companies facing lawsuits for infringing Oyster's patents from taking advantage of Coriant's Agreement."  (Dkt. No. 44 at 14.)  By "[w]orking with Infinera to structure the purchase transaction in an attempt to extend the release and license to cover Infinera's own products, Coriant attempted to frustrate this purpose of the Agreement and breached the no-circumvention covenant."  (*Id.*)

The Court once again finds no support in the Agreement for Oyster's suggested interpretation.  Oyster submits that the Agreement was intended to only settle its lawsuit with Coriant, and was not meant to cover other claims asserted in the Consolidated Litigation.  While the Court agrees that the purpose of the contract was to settle Oyster's claims against Coriant, "the Agreement's broad definition of 'Affiliate' as including parents 'now or in the future,' the release clause's express inclusion of 'future . . . parents,' and the Agreement's explicit statement that it shall 'inure to the benefit of . . . future Affiliates,' all conclusively establish [that] the [A]greement was [also] written and intended to cover future parent companies" of the Parties.  (Dkt. No. 46 at 9.)  By enforcing the clear terms of the Agreement, there can be no violation of the No Circumvention Clause.  Oyster's argument is without merit and is rejected by the Court.

### E.  Discovery

Oyster also requests that the Court defer a ruling on the Motion to permit further discovery "as to Infinera's and its subsidiaries' sale and supply of components and products to Infinera, and whether Coriant worked with Infinera in an attempt to circumvent the terms of the Agreement." (Dkt. No. 44 at 16.)  "Because the agreement is clear and complete on its face, '[a]ny such discovery would simply be an opportunity for plaintiff to uncover parol evidence to attempt to

*create* an ambiguity in an otherwise clear and unambiguous agreement." *Ashwood*, 948 N.Y.S.2d at 299 (emphasis in original).  Accordingly, Oyster's request is denied.

## IV.     CONCLUSION

Based on the foregoing and for the reasons stated herein, the Court **GRANTS** Defendant Infinera Corporation's Motion for Summary Judgment Regarding Its License and Release Defenses (Dkt. No. 39).   The Parties are **ORDERED** to file within forty-eight (48) hours of the issuance of this Order a Joint Status Report that specifically identifies (1) all claims or counterclaims, if any, that remain live before the Court; (2) all claims or counterclaims, if any, that have been rendered moot; and (3) the resulting status of this case, in light of this opinion.

So ORDERED and SIGNED this 25th day of June, 2019.

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE